IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | No. 1:20CR83 |
| v. | § § | Judge Heartfield |
| ANTHONY LEVI COCHRAN | § § | |

## FACTUAL BASIS AND STIPULATION

The United States of America presents to the Court, by and through the undersigned Assistant United States Attorney for the Eastern District of Texas, and the undersigned Trial Attorney for the United States Department of Justice's Organized Crime and Gang Section, joined by the defendant, **Anthony Levi Cochran,** and the defendant's attorney, Dustin Ryan Galmor, this factual basis and stipulation in support of the defendant's plea of guilty to Count Two of the Indictment, and in support thereof, would show the following:

1. That the defendant hereby stipulates and agrees to the truth of all matters set forth in this factual basis and stipulation, and agrees that such admission may be used by the Court in support of his plea of guilty to Count Two of the Indictment, which charges a violation of 18 U.S.C. § 1959(a)(3), assault resulting in serious bodily injury in aid of racketeering.

2. That the defendant, who is pleading guilty to such Indictment, is one and the same person charged in the Indictment.

3. That the events described in the Indictment occurred in the Eastern District of Texas, and elsewhere.

4.  That had this matter proceeded to trial, the government, through the testimony of witnesses, including expert witnesses, and through admissible exhibits, would have proven, beyond a reasonable doubt, each and every essential element of the offense alleged in the Indictment; specifically, the government would have proven the following stipulated facts:

### The Racketeering Enterprise:   The Aryan Circle

At all times relevant to the Indictment, the defendant **Anthony Levi Cochran,** and others, known and unknown, were members of the Aryan Circle (hereinafter "AC"), a criminal organization whose members and associates engaged in controlled substances distribution, firearms trafficking, and acts of violence, including acts involving murder, kidnapping, assault, robbery, and witness intimidation.  At all times relevant to the Indictment, the AC operated throughout the Eastern District of Texas, the states of Alabama, Arkansas, Indiana, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, Virginia, and elsewhere.

The AC was a violent, race-based, "whites only" prison-based gang with hundreds of members operating inside and outside of state and federal penal institutions in states throughout the country.  The AC offered protection to white inmates if they joined the gang. The AC had a detailed and uniform organizational structure, which is outlined - along with various rules, procedures, and code of conduct - in a written "constitution" widely distributed to members.

The AC was established in approximately 1985 within the Texas Department of

Criminal Justice (TDCJ), where the traditional power centers of the AC and members of the gang's leadership structure resided. In recent years, the AC's structure and influence expanded to rural and suburban areas throughout Texas, Louisiana, Arkansas, Missouri, and Indiana, among other states. The AC emerged during a period of internal turmoil within the Aryan Brotherhood of Texas (hereinafter "ABT"). Its original membership included several ex-ABT members as well as others rejected for ABT membership. The AC was relatively small in comparison to other prison-based gangs but grew in stature and influence within TDCJ in the 1990s, largely through violent conflicts with other gangs, white and non-white alike, including the Mexican Mafia, the ABT, and others.

The AC had a defined militaristic structure. AC members referred to the gang as the "Family." The AC had a complex organizational structure, which continued to evolve over time. The AC was overseen and directed by a five-member "Upper Board." The Upper Board had ultimate authority in all gang matters. Subordinate ranking members served to support the Upper Board to enforce gang members' discipline and adherence to established AC rules and laws. The Upper Board was comprised of the president, vice president, administrative chairman, and two other members. The AC had five branches: one for Texas prisons; one for the federal prison system; one for out of state prisons; one for international members; and one for the "free world" (non-incarcerated gang members), each of which had its own Middle Board. The AC also had a subgroup known as a motorcycle biker branch. The out of state prisons were further divided into a handful of regions, each incorporating one or more states. The Middle Boards each included the

Upper Board members, as well as the vice president and director of each branch. Rules and regulations for the various branches came from Center Rings, which included all Middle Board Members.

The AC was also divided between prison and free world chains of command. Each prison had its own hierarchy. In the free world, Texas was divided into districts and presided over by district captains, who reported to majors, who in turn controlled a number of districts. The AC's ranking structure remained largely constant; however, personnel changes (promotions, demotions, and terminations) occurred frequently.

The AC also had certain members assigned to the "Task Force," which was comprised of a small group of members handpicked by the Upper Board to enforce the rules of the organization and perform specific tasks or responsibilities. Such tasks could range from managing some aspect of the AC's organization to performing a "hit" or other specific criminal act of violence, including meting out punishment against fellow gang members who violated the gang's rules or killing rival gang members.

AC Upper Board leaders had the authority within the gang to issue "D.O.'s" (direct orders) and to mete out punishment. A D.O. was an assignment given to a subordinate AC member that would serve a purpose for the AC. The D.O. could range from a leader ordering a "violation," classified as "minor, serious, or major," an "S.O.S." (smash on sight), to a "Green Light," meaning an attack up to and including the murder of a rival gang member or of an AC member or associate who had committed an egregious violation of the gang's rules. Failure to perform a D.O. resulted in the assigned member being in

violation of the rules. Punishment for failing to complete the D.O. could range anywhere from a fine, written violation, beating, or death.

Members of the AC greeted each other and showed their membership in the gang using a handshake intended to represent the motto: "Silence is Golden; Silence is Deadly; Silence is Mandatory; My Honor is called Loyalty!" The colors associated with the AC were blue and gray, and members of the AC often demonstrated their affiliation with the AC by wearing clothing containing the colors blue and gray or incorporating some of the gang's other symbols or phrases. The AC used depictions of Nazi-style inspired symbols and artwork to demonstrate their affiliation. Members often had tattoos incorporating one or more Nazi-style symbols including, but not limited to, the Iron Cross, eternal flame, "13" (for first and third letters of the alphabet – "AC"), swastika, and Schutzstaffel ("SS") lightning bolts, as well as State-specific symbols.

The most coveted tattoo of AC membership was the AC patch, which could be worn only by fully made members who generally ascended to full membership by committing a "blood-in mission" (aggravated assault or murder) on behalf of the gang. The design and shape of the patch evolved over time. The diamond tattoo was the basic AC tattoo or "patch." It had many variations, including variations for different states, though common to each tattoo was a swastika tilted to resemble a diamond, "SS" bolts, and the letters "AC" in the center. An older version of the AC patch was a circle with "SS" bolts inside it. AC lexicon included "113%" (100% Aryan Circle), "1388" or Aryan Circle variation of

Factual Basis and Stipulation – Page 5

white supremacist code "14/88" (the 88 stood for Heil Hitler), "CFFC" (Circle Forever, Forever Circle), and "DFFD" (Diamond Forever, Forever Diamond), among others.

Once released from incarceration, AC members were required to remain loyal to the gang and were required to immediately report to outside leaders to further the goals of the AC through criminal activity. Membership in the AC was for life and there was no retirement from the AC. All AC members were required to attend monthly "church" meetings where criminal activity was discussed, financial proceeds from criminal activity were collected including, but not limited to, collection of drug proceeds from subordinate gang members for senior AC gang leaders, and disciplinary beatings of fellow AC gang members were administered.

One of the goals of the AC was to recruit new members. AC members were recruited from both inside and outside state and federal penal institutions. In order to be considered for AC membership, a person had to be sponsored by another AC member. Once sponsored, a prospective member had to serve a "pre-prospect" term, during which he was referred to as a prospect, and his conduct was observed by other gang members. During this period, the prospect was required to study and learn the AC constitution and laws. During the prospect period, the individual was considered part of the AC family and entitled to the full protection of the gang. The prospect was also subject to the rules and orders of the gang. If the prospect's conduct during the probationary period was deemed satisfactory, his membership to the gang was submitted to the gang members for a

vote. The prospect could be "black-balled" by a single member of the gang, and refused admission to the AC.

All incarcerated AC members were expected to "put in work" for the "family" in order to earn the right to wear the AC patch. This normally required committing an act of violence on behalf of the organization. This rule was more loosely applied for AC members in the free world than for those in custody.

Unlike most major prison-based gangs, the AC admitted women as full members during its history and had a significant female membership. Some women achieved positions of considerable importance and responsibility within the organization. In addition to female members, the enterprise included those closely affiliated with the AC, including wives or girlfriends of AC members who were not themselves full patched members but were still associates of the AC. They were allowed to associate with the AC so long as they complied with the gang's rules and served to promote the goals of the "family." Female associates functioned as communications hubs, facilitating gang communications and criminal activities among imprisoned members throughout the penal system by using the telephone, the internet, the United States Mail, and common carriers. They also smuggled drugs, cellular telephones, and other items of contraband to imprisoned gang members.

The AC, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Sections 1961(4) and 1959(b)(2) (hereafter "the enterprise"), that is a group of individuals associated in fact, which was engaged in, and

the activities of which affected, interstate commerce. The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

The purposes of the enterprise included, but were not limited to, the following:

    a.    Enriching the leaders, members, and associates of the enterprise through, among other things, illegal trafficking of controlled substances and firearms;

    b.    Preserving, protecting, and enhancing the power, territory, reputation, and profits of the enterprise through the use of threats, intimidation, and acts of violence including, but not limited to, acts involving murder, kidnapping, assault, robbery, and obstruction of justice;

    c.    Promoting and enhancing the enterprise and the activities of its leaders, members, and associates;

    d.    Keeping victims in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and actual violence; and

    e.    Providing financial support to gang members who were charged with or incarcerated for gang-related activities.

The means and methods by which the leaders, members, and associates conducted and participated in the conduct of the affairs of the AC criminal enterprise included the following:

    a.    The leaders of the enterprise directed, sanctioned, approved, and permitted other members and associates to carry out acts in furtherance of the enterprise;

    b. Members and associates of the enterprise committed, conspired to commit, and threatened to commit acts of violence, including acts involving murder, kidnapping, robbery, assault, and witness intimidation to protect the enterprise's power, territory, and property;

    c. To generate income and build reputation, enterprise members and associates engaged in illegal activities under the protection of the enterprise, including, but not limited to, controlled substances trafficking and weapons trafficking;

    d. For protection, attacks, and armed combat, enterprise members and associates in the free world acquired, carried, and used firearms, and enterprise members and associates in prisons acquired, carried, and used sharp, knife-like objects, or shanks;

    e. Members and associates of the enterprise employed and used gang-related terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang;

    f. To perpetuate the enterprise and to maintain and extend their power, members and associates of the enterprise committed and conspired to commit acts involving murder, kidnapping, robbery, witness intimidation, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, such as members of rival organizations, AC members who violated AC rules, and witnesses to illegal activities of the enterprise;

**Factual Basis and Stipulation – Page 9**

g.  Members and associates of the enterprise talked in code when communicating over the telephone and/or in writing to avoid law enforcement detection, and communication in person was always preferable; and

h.  Members of the enterprise and their associates were forbidden from cooperating with law enforcement.  Legal paperwork was reviewed for signs of cooperation.

The above-described enterprise, through its members and associates, engaged in a pattern of racketeering activity as defined in Sections 1961(1) and (5) of Title 18, United States Code, that is, multiple acts involving murder, in violation of Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, and Virginia state law; multiple acts involving kidnapping, in violation of Missouri state law; and multiple offenses involving trafficking in controlled substances, in violation of Sections 841(a)(1), 846, and 843 of Title 21, United States Code.

All defendants named in the Indictment charging this defendant were members or associates of the AC.

### The Defendant

**Anthony Levi Cochran** was an Aryan Circle member since at least 2002, and admitted his gang affiliation to law enforcement on separate occasions in 2008 and 2012. **Cochran** has tattoos indicating his gang affiliation.  **Cochran** has attended and participated in church meetings and paid gang dues during the course of his membership.

**Cochran** knew that AC members engaged in racketeering activity, including acts involving murder and drug trafficking.

Prior to October 2, 2016, AC members learned that K.C. wanted to switch his gang affiliation, or "patch over," from the AC to the Banditos. Michael Martin, a/k/a "Aryan Prodigy," a/k/a "AP," ordered AC members to attack K.C. in order to "x," or remove him from the gang, because it violated the AC's rules to join another organization. Rodney Shane Holt, a/k/a "Turbo," hosted a "church," or gang meeting, at his home in the Tyler, Texas area where AC members including Martin, Holt, **Cochran**, Bobby Dayle Boney, Glynnwood Derrick, and Michael Lyons were present where CK were planned the logistics of the beating. Those at the meeting discussed how they needed to "handle some business" as it related to K.C., which the AC members understood would include violence. The planning involved setting ground rules for how the assault would take place.

On October 2, 2016, **Cochran** and other AC members including Martin, Holt, Boney, Derrick, and Lyons, met at the park near Tyler, Texas, where they had planned to discipline K.C. Members of the Banditos drove to the site with K.C. K.C. contacted AC members prior to arriving at the site begging that they not carry out the beating. Once they arrived at the park, Martin announced that the AC members had brought firearms.

**Cochran** and Boney used their hands and feet to strike K.C. multiple times. In addition to punching him, K.C. was kicked in the head while he was on the ground. **Cochran** continued striking K.C. while he was balled up on the ground and Boney kicked him at least once while he was on the ground. Some of the blows were to K.C.'s face.

Factual Basis and Stipulation – Page 11

K.C. did not fight back. Members of the Banditos stopped the beating. When the beating ended, Martin approached K.C., crouched down next to K.C. on the ground, and told him that he could have been beaten worse and that "we," the AC, "kill people."

K.C. received treatment at an area hospital for his injuries. Those injuries included fractures to the left orbital floor and the left medial ethmoid bones, a nasal septum fracture, and a fractured tooth that broke in half and needed to be removed. K.C. suffered from migraine headaches and blurred vision for years as a result of the injuries he sustained from the beating.

**Cochran** committed the beating because it was expected of him as an AC member, and he therefore acted to maintain his position within the gang. Had it not been for his position within the gang and his desire to remain in good standing, he would not have been involved in the attack.

## DEFENDANT'S SIGNATURE AND ACKNOWLEDGMENT

5. I have read this factual basis and stipulation and the Indictment or have had them read to me and have discussed them with my attorney. I fully understand the contents of this factual basis and stipulation and agree without reservation that the United States can prove each of these acts and that it accurately describes the events about my acts and the events as recited as I know them.

Dated: 7-06-21

ANTHONY LEVI COCHRAN
Defendant

## DEFENSE COUNSEL'S SIGNATURE AND ACKNOWLEDGMENT

6. I have read this factual basis and stipulation and the Indictment and have reviewed them with my client, **Anthony Levi Cochran**. Based upon my discussions with the defendant, I am satisfied that the defendant understands the factual basis and stipulation as well as the Indictment, and is knowingly and voluntarily agreeing to these stipulated facts.

Dated: 7-6-21

_____
DUSTIN RYAN GALMOR
Attorney for the Defendant

Respectfully submitted,

NICHOLAS J. GANJEI
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF TEXAS

DAVID L. JAFFE, CHIEF
ORGANIZED CRIME AND GANG SECTION

_____
CHRISTOPHER RAPP
Assistant United States Attorney

_____
BETHANY LIPMAN
Trial Attorney

**Factual Basis and Stipulation – Page 13**