IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 1:20-CR-83-11 |
| | § | Judge Heartfield |
| ANTHONY LEVI COCHRAN | § | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Comes now, the United States of America, by and through the United States Attorney for the Eastern District of Texas and the Chief of the Department of Justice's Organized Crime and Gang Section, and files this sentencing memorandum in support of its recommendation that this Court sentence Defendant Cochran to a term of imprisonment at the high end of his guidelines range as determined by this Court at sentencing.

**I.    FACTS AND PROCEDURAL HISTORY**

Defendant Anthony Levi Cochran is an admitted member of the Aryan Circle—a violent, race-based gang that originated in Texas and has spread to states around the country. On October 7, 2020, a federal grand jury sitting in Beaumont, Texas, returned an indictment charging the Defendant with one count of Assault Resulting in Serious Bodily Injury in Aid of Racketeering. *See* ECF No. 2 ("Indictment") at 18-19 (Count Two). The charged offense carries a statutory maximum penalty of twenty years of imprisonment. 18 U.S.C. § 1959(a)(3).

On July 6, 2021, Defendant Cochran pled guilty without a plea agreement before the Honorable United States Magistrate Judge Keith Giblin. In support of his guilty plea,

1

the Defendant signed a Factual Basis and Stipulation. ECF No. 223 ("Factual Basis"). The Defendant admitted in that document that he was a member of the Aryan Circle since at least 2002. *Id.* at 10. He further admitted attending gang meetings, called "churches," and paying gang dues during the course of his membership. *Id.* The Defendant also admitted that he "knew that AC members engaged in racketeering activity, including acts involving murder and drug trafficking." *Id.* at 11. Despite this knowledge, Defendant Cochran continued participating in the gang.

As part of his membership, Defendant Cochran admitted to personally assaulting the victim in this case using his hands and feet. *Id.* The Factual Basis states that after learning an Aryan Circle member wanted to leave the AC to join a different gang, a high-ranking AC member ordered AC members to attack the victim in order to "x," or remove him from the gang. *Id.* at 11. The Defendant attended a "church," or gang meeting, along with no fewer than five other AC members, where "the logistics" of the attack to be carried out against the victim "were planned." *Id.*[1] The planning, for which the Defendant was present, "involved setting ground rules for how the assault would take place." *Id.*

Then, on October 2, 2016, Defendant Cochran and other AC members met at a park near Tyler, Texas to carry out the removal, despite the victim's contact with AC members prior to the beating "begging that they not carry out" the attack. *Id.* After arriving, the AC leader who ordered the attack "announced that the AC members had brought firearms." *Id.*

---

[1] The Defendant requested alterations to the Factual Basis at his plea hearing, which counsel for the United States made. The United States does not believe the changes alter the guidelines calculation.

Defendant Cochran personally carried out the assault, along with one other AC member. *Id.* They struck the victim multiple times using their hands and feet, and kicked him in the head while he was on the ground. *Id.* The Defendant "continued striking [the victim] while he was balled up on the ground" and "[s]ome of the blows were to [the victim's] face." *Id.*

Members of the other gang ultimately stopped the assault. *Id.* at 12. After they did so, however, the AC leader who ordered the attack "approached [the victim,] crouched down next to [the victim] on the ground, and told [the victim] that he could have been beaten worse and that 'we,' the AC, kill people." *Id.* The victim received treatment at a hospital for his injuries and suffered continued "migraine headaches and blurred vision" for years after the assault. *Id.*

Based on these and other facts the Defendant admitted, the Probation Officer applied the following enhancements to the Defendant's offense conduct:

- A two-level enhancement because the offense involved "more than minimal planning," pursuant to U.S.S.G. § 2A2.2(b)(1);

- A three-level enhancement because "a dangerous weapon . . . was brandished or its use was threatened," pursuant to U.S.S.G. § 2A2.2(b)(2)(C); and

- A five-level enhancement because the victim "sustained serious bodily injury," pursuant to U.S.S.G. § 2A2.2(b)(3)(B).

ECF No. 372, PSR ¶¶ 33-35. With those enhancements added to the base offense level of 14, the Defendant's resulting offense level, after a three-point reduction for acceptance of responsibility, was calculated to be 21. *Id.* at ¶ 43.

## II.     DEFENDANT'S GUIDELINES OBJECTION

The Probation Officer calculated Defendant Cochran's guidelines range as 77 to 96 months based on a total offense level of 21 and a criminal history category of VI. PSR ¶ 98. The Defendant objected to the PSR's application of a three-point enhancement based on the conclusion that "a dangerous weapon (including a firearm) was brandished or its use was threatened," pursuant to U.S.S.G. § 2A2.2(b)(2)(C). *Id.* at Addendum, 25. Specifically, according to the PSR's summary of the Defendant's objection, he argued that the attack was carried out without weapons, and the AC leader's announcement that AC members brought firearms with them was insufficient to justify the enhancement. PSR Addendum at 25. The Defendant also argued that any threat to use a firearm by a co-defendant cannot apply to him as relevant conduct. *Id.*

After Defendant Cochran's plea hearing and after the draft PSR was issued, counsel for the United States exchanged emails with defense counsel agreeing that Defendant Cochran would not object to application of the other two enhancements referenced above and that the United States would not advocate for application of the dangerous weapon enhancement. Although the United States stands by that agreement and does not now advocate for the dangerous weapon enhancement, the United States does provide factual information below for the Court's consideration in calculating the guidelines range and imposing an appropriate sentence. *See United States v. Pizzolato*, 655 F.3d 403, 410 (5th Cir. 2011) ("[A] prosecutor has the duty as an officer of the court to inform the court of all factual information relevant to the defendant's sentence so that a sentence may be imposed upon a complete and accurate record.") (internal alterations omitted).

4

As agreed in the Factual Basis, upon arriving at the park where the assault would take place, an AC leader "announced that the AC members had brought firearms." Factual Basis at 11. Immediately after the assault and while the victim was still on the ground, that leader "crouched down next to [the victim] on the ground, and told [the victim] that . . . '"we,' the AC, 'kill people.'" *Id.* at 12. In addition to this, several co-defendants gave statements to law enforcement indicating that Defendant Cochran personally had a firearm at the scene, though he did not actually use it during the assault.

Specifically, on January 15, 2019, a co-defendant gave a Mirandized interview and stated that prior to the assault, Defendant Cochran displayed his firearm and laid it on top of a vehicle for all to see. On May 15, 2019, a witness testified before the grand jury that after arriving at the park where the assault occurred, "Levi Cochran comes out with a pistol," but was then instructed by Martin to put the weapon away. The same witness told law enforcement agents on November 7, 2017 that at the time of the assault, both Levi and "AP," or Martin, had pistols. During that earlier interview, the witness stated that the victim was not kicked, but that dirt was kicked into the victim's face. On March 4, 2020, the victim testified before the grand jury that immediately following the assault, co-defendant Martin "put a gun" to the victim's head and stated that the only reason the AC was letting the victim live was because the Banditos were there. The victim further testified that the victim was kicked in the face with a steel-toed boot.[2]

---

[2] Another co-defendant provided a Mirandized interview on August 23, 2017. During that interview, the co-defendant stated that "[a] few of the guys had weapons [at the scene]," specifying that "Thor had a pistol, Bobby [Boney] had a pistol." One additional co-defendant stated on October 14, 2020 that co-defendant Martin told the Banditos that they [the AC members] had brought guns to the park, but that he did not show a gun; that

5

As to the Defendant's argument that this enhancement falls outside the scope of relevant conduct under the guidelines, the United States submits that "for purposes of determining the offense level, a defendant is accountable not only for his own acts but also for 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *United States v. Fuentes-Jaimes*, 301 F. App'x 379, 382-83 (5th Cir. 2008) (quoting U.S.S.G. § 1B1.3(a)(1)(B)). Defendant Cochran personally violently attacked the victim, and was also present at the gang meeting for its planning. Factual Basis at 11. His admissions in the Factual Basis further establish that he was no stranger to the threatened use of dangerous weapons by virtue of his membership in the Aryan Circle, a "violent, race-based, 'whites only' prison-based gang." *Id.* at 2. Defendant Cochran knew that the Aryan Circle engaged in "firearms trafficking," and that its purposes included preserving, protecting, and enhancing the gang's power, territory, reputation, and profits through "the use of threats, intimidation, and acts of violence." *Id.* at 2, 8. He further admitted knowing that "free world" gang members "acquired, carried, and used firearms" "[f]or protection, attacks, and armed combat." *Id.* at 9.

### III.   SECTION 3553(a) FACTORS

18 U.S.C. § 3553 mandates consideration of various factors to fashion a sentence that is "sufficient, but not greater than necessary" to effectuate the purposes of sentencing. In this case, the guidelines range is entirely reasonable in light of those factors. More

---

another AC member had a pistol and tried to give it to a co-defendant, but the co-defendant declined to take the pistol; and that the AC member referenced always had a gun in his pocket. The co-defendant also stated that the victim was kicked while he was on the ground, but not in the face, and stated that co-defendant Boney, who also personally committed the attack, did not wear steel-toed boots.

specifically, a high-end guidelines sentence is necessary to adequately reflect the seriousness of Defendant Cochran's conduct and the harm he inflicted as one of two Aryan Circle members who committed a violent beating for the gang. The nature and circumstances of the offense, the history and characteristics of the Defendant, the need to promote respect for the law, to provide adequate deterrence, and the avoidance of unwarranted sentencing disparities, all counsel in favor of a sentence at the high end of the guidelines as calculated by this Court at sentencing.

1. **Nature and Circumstances of the Offense**

As described above, the facts surrounding this offense are serious. After hearing that the victim wanted to leave the Aryan Circle and join another gang, Defendant Cochran and others met up and violently assaulted the victim in order to "x," or remove him, from the gang. Defendant Cochran personally inflicted serious injuries on the victim, including by continuing to beat him once he was on the ground. An Aryan Circle leader also threatened the victim, essentially stating that the gang took it easy it on him by not killing him for the transgression. These things were done in the name of the Aryan Circle for the purpose of maintaining and increasing position within the gang. The crime is more egregious, not less, where the Defendant committed it because it was expected of him as a member of the gang. Collective and conspiratorial action is far more serious than the actions of any one individual. Defendant Cochran's willingness to engage with the Aryan Circle for almost two decades and to carry out this beating on the gang's behalf highlight the severity of the offense.

### 2. Cochran's History and Characteristics

Defendant Cochran's history and characteristics also counsel in favor of a sentence at the high end of his guidelines range. He has numerous prior convictions, which resulted in the highest criminal history category possible. His criminal history dates back to 1998. PSR ¶ 46. His prior convictions include a 2010 conviction for felon in possession of a firearm after the Defendant sold two firearms to undercover agents. PSR ¶ 57. They also include a conviction for assault causing bodily injury. PSR ¶ 53. Defendant Cochran's other convictions include drug offenses, theft, evading arrest, and forgery offenses, among others. PSR ¶¶ 47, 50, 51, 54, 55, 56. He also has pending charges for the manufacture or delivery of a controlled substance and engaging in organized criminal activity, for which he was arrested in 2019. PSR ¶ 64.

The Defendant accumulated this substantial criminal history and actively participated in the Aryan Circle despite having a positive upbringing and what appears to have been a strong family support system. PSR ¶ 73-75. He has no known mental or emotional health issues. PSR ¶ 79.

### 3. Promote Respect for the Law

Gang members like those in the Aryan Circle operate in a world with its own sovereign regime. They believe that the Constitution and codes of the gang outweigh the laws of the United States and that their actions—drug trafficking, violent assaults, and even acts involving murder—are beyond reproach when done with the purpose of furthering the criminal enterprise. In short, they believe that the laws of this country do not apply to them. The gang actively recruited members in states across the country both inside and

outside of prison, and has continued spreading its doctrines past the period of the original indictment in this case. As a member of the gang for close to two decades, a sentence at the high end of the guidelines range would sufficiently promote respect for the law.

Also relevant to the Court's consideration of this factor are the numerous instances in which Defendant Cochran disregarded court directives, ran from law enforcement, or otherwise showed disrespect for the law. For instance, the PSR describes "numerous instances of noncompliance" in relation to his period of federal supervised release for a felon in possession conviction in the Eastern District of Texas. PSR ¶ 57. The Defendant also had his probation revoked on a 2000 conviction for violating conditions of probation. *Id.* at ¶ 48. In 2001, the Defendant led police on a high speed chase for approximately eight miles before his apprehension, at which point he disobeyed an officer's commands, struck the officer, and struggled to the point where the officer needed to use pepper spray to subdue the Defendant. *Id.* at ¶ 49. His probation was again revoked for another conviction in 2006 due to probation violations including failure to report, failure to pay fees, and failure to submit to a substance abuse evaluation. *Id.* at ¶ 51. And as the PSR states, Defendant Cochran was on supervised release at the time he committed the instant offense. *Id.* at ¶ 60. In this case, law enforcement was unable to locate and arrest Defendant Cochran for nearly two months despite making efforts to do so. Overall, this demonstrated pattern of disrespect for the law further supports imposition of a substantial prison term for Defendant Cochran.

### 4. Need for Deterrence

The need for deterrence in this case is unusually acute. First, the harm caused to

communities by gang violence is grave, vastly increasing the importance of preventing future victimization. Second, the extent of premeditation and that this type of crime is encouraged by the rules of the organization, means that offenses like this one can be more effectively deterred if those who engage in this conduct fully understand the risks and consequences of such behavior. This factor therefore counsels in favor of a sentence at the high end of the guidelines.

### 5. Relative Culpability

The recommended sentence would also appropriately reflect the relative culpability of the various defendants charged in this case and thereby avoid unwarranted sentencing disparities. Unlike co-defendants who were present for the assault, but did not personally lay hands or feet upon the victim, this Defendant physically attacked the victim by striking him repeatedly, including by kicking him while he was on the ground. The victim's injuries required treatment at the hospital and their effects lasted for years. While some co-defendants deserve lower sentences for their roles in merely aiding and abetting this assault, the Court should hold this Defendant accountable for his sizable role in the offense and sentence him accordingly.

## IV. CONCLUSION

For the reasons set forth above, the United States recommends that this Court sentence Defendant Cochran to the high end of the guidelines range determined by this Court at sentencing.

Respectfully submitted,

BRIT FEATHERSTON
UNITED STATES ATTORNEY

*/s/ Christopher Rapp*
Christopher Rapp
Assistant United States Attorney
Arizona Bar No.: 025704
550 Fannin St., Suite 1250,
Beaumont, Texas 77701
(409) 839-2538
Christopher.T.Rapp@usdoj.gov
(409) 839-2550 (fax)

DAVID L. JAFFE, CHIEF
ORGANIZED CRIME & GANG SECTION

*/s/ Bethany Lipman*
Bethany Lipman
Trial Attorney
Organized Crime and Gang Section
New York Bar No: 5325444
1301 New York Avenue, NW, Suite 701
Washington, D.C. 20005
(202) 431-9453
Bethany.Lipman@usdoj.gov

*/s/ Rebecca Dunnan*
Rebecca Dunnan
Trial Attorney
Organized Crime and Gang Section
New York Bar No: 5121249
1301 New York Avenue, NW, Suite 701
Washington, D.C. 20005
(202) 355-5652
Rebecca.Dunnan@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this sentencing memorandum was served on defense counsel by email and electronic filing (CM/ECF) on this 3rd day of January, 2022.

*/s/ Bethany Lipman*
Bethany Lipman